Argued and submitted October 26, 2015, affirmed August 10, petition for review denied December 22, 2016 (360 Or 751)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

THURLOW EARNEST HANSON,
*Defendant-Appellant.*

Deschutes County Circuit Court
10FE1561MS; A155691

380 P3d 1136

A. Michael Adler, Judge.

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. Thurlow Hanson filed the supplemental brief *pro se.*

Paul L. Smith, Deputy Solicitor General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and Wollheim, Senior Judge.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for four counts of first-degree sexual abuse. ORS 163.427. On appeal, he raises four assignments of error.[1] We reject defendant's second and third assignments of error without discussion, and write to address his first and fourth assignments. In his first assignment of error, defendant contends that the trial court committed plain error when it failed to strike testimony of the victim's mother that, according to defendant, constituted vouching evidence. In his remaining assignment, defendant asserts that the court erred in denying his motion to strike testimony from the victim's treating psychologist that the victim suffered from post-traumatic stress disorder (PTSD). As explained below, we reject both of those arguments and, accordingly, affirm the judgment of the trial court.

Defendant and the victim's mother, who lived in Russia, met online and married soon thereafter. The victim and her mother then came to live with defendant in the United States. The family lived first in New York and then, in 2003, when the victim was 12, moved to Sisters, Oregon.

In 2009, having been diagnosed with an untreatable sexually transmitted disease, the victim disclosed to her doctor that defendant had sexually abused her. The doctor's report of the abuse was transmitted to law enforcement, who then interviewed the victim and her mother. During that interview, the victim described the sexual abuse to the interviewing officer. The victim began to see Dr. Young, a psychologist in January 2011. During sessions with Young, the victim discussed the sexual abuse. To both Young and the officer who had interviewed her, the victim described extensive ongoing sexual abuse by defendant.

Defendant was charged with four counts of first-degree sexual abuse. At trial, the victim testified and described the abuse, which she stated had begun in New York and continued when the family moved to Oregon. According to the victim, while they lived in New York, defendant had

---

[1] Defendant raises additional assignments of error in a *pro se* supplemental brief. We reject those assignments without discussion.

touched her breasts and vaginal area while masturbating and had also had intercourse with her. After they moved to Oregon, defendant had the victim "masturbate him" with her hands on many occasions. Defendant also attempted to have intercourse with the victim but she "would yell very loudly and * * * fight back."

During the victim's testimony, the state asked whether she had ever hurt herself intentionally. The victim testified that she had done so when she was younger:

"A.   I did.

"Q.   How did you do that?

"A.   I would cut my wrists. I would burn my hands and my wrists. I would cut my legs.

"Q.   What did you cut your wrists and your legs with?

"A.   Sometimes like a shaving razor. And then like little scissors, like nail scissors, or just a pen.

"Q.   Do you have any—any scars from this?

"A.   I do, on—on both my wrists and my hand and some on my leg. Fortunately, they're not very big."

The victim's mother testified at trial that she had never seen defendant touch the victim inappropriately. During her testimony, the state asked the victim's mother if she noticed the victim's injuries:

"Q.   And did you notice, * * * did she ever have any injuries on her—

"A.   Yeah. She started to have—

"Q.   —wrists or legs?

"A.   She did have a lot of cuts everywhere. And I was asking her what is the cause, but she didn't say anything. She—she never lies, and she just didn't say anything.

"Q.   She just wouldn't answer you when you asked where the cuts came from?

"A.   Yeah. She'd never answer.

"Q.   Right.

"A.   Because she never lies. She's [a] very truthful child."

The state also offered evidence from Young regarding the victim's mental state. Specifically, Young testified that she diagnosed the victim with PTSD. She testified that she made that diagnosis after her first meeting with the victim in January 2011, several months before the victim talked with Young about the sexual abuse. In her testimony, Young also specifically described the signs of PTSD she observed in the victim that led her to conclude that the victim suffered from PTSD. According to Young's testimony, PTSD is characterized by three main symptoms: a traumatic event, avoidance, and hyperarousal. Young testified that the victim sought counseling, in part, because of "something that happened in the past that * * * she needed to resolve; that it had been bothering her for a long time." According to the victim, she had "something that had happened that she wanted to talk about, that someone had hurt her." According to Young, the victim had "symptoms consistent with [PTSD] from * * * the beginning." Specifically, the victim's statements that something bad happened that she needed to resolve led Young to believe that there had been some trauma in the victim's past. In addition, Young noted that the victim engaged in avoidance, both by seeking not to talk about the details of the trauma and by using alcohol to "numb those feelings of anxiety and distress." Finally, according to Young, the victim suffered from hyperarousal. The victim's life was riddled with anxiety and Young observed shaking in the victim's hands, along with trembling and fragmented speech. Based on all of those observations, Young diagnosed the victim with PTSD. Before Young testified, defendant objected to testimony regarding a diagnosis of PTSD. In addition, after Young testified, defendant moved to strike the PTSD diagnosis. The court denied defendant's motion.

Defendant testified in his own defense that none of the alleged sexual contact with the victim had occurred. Ultimately, the jury found defendant guilty on all four counts, and the court entered a judgment of conviction.

As noted, in his first assignment of error on appeal, defendant asserts that the trial court erred in failing to strike the testimony of the victim's mother regarding the victim's credibility. Defendant acknowledges that he failed to preserve his contention. However, he asserts that the trial

court's failure to *sua sponte* strike the testimony constituted plain error. *See* ORAP 5.45(1) (we consider only claims of error that are "preserved in the lower court * * * provided that the appellate court may consider an error of law apparent on the record"). In defendant's view, when, in response to the state's questions regarding cuts on the victim's wrists or legs, the victim's mother stated that the victim "never lies" and "is a very truthful child," the court should have interrupted the testimony and *sua sponte* stricken those statements.

The evidence at issue was, as defendant asserts, vouching evidence. That is, it was a comment by a witness regarding the credibility of another witness in the case. In Oregon, the rule is that "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). "That rule applies 'whether the witness is testifying about the credibility of the other witness in relation to the latter's testimony at trial or is testifying about the credibility of the other witness in relation to the statements made by the latter on some other occasion or for some reason unrelated to the current litigation.'" *State v. Wilson*, 266 Or App 481, 489, 337 P3d 990 (2014), *rev den*, 356 Or 837 (2015) (quoting *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993)). As we noted in *Wilson*,

> "[e]xamples of testimony that is impermissible as a direct opinion on the honesty or credibility of another witness include (1) testimony by the victim's mother that she never doubted [the victim] for a second, *State v. Vargas-Samado*, 223 Or App 15, 17, 195 P3d 464 (2008); (2) testimony that there is no lying going on about what [the complainant is] telling us in this evaluation, *State v. Hollywood*, 250 Or App 675, 677, 282 P3d 944 (2012); and (3) testimony that the witness didn't think that [the defendant] was being very honest and upfront, *State v. Lowell*, 249 Or App 364, 366, 277 P3d 588, *rev den*, 352 Or 378 (2012)."

*Id.* at 489-90 (second and fourth brackets in original; internal quotation marks omitted).

Thus, the victim's mother vouched for the credibility of the victim. However, because defendant failed to object to the testimony in question, we must determine whether

the trial court committed plain error in failing to *sua sponte* strike it. In considering an unpreserved claim of error, we first determine whether the trial court plainly erred. An error is "plain"

> "if (1) the error is one of law, (2) the error is obvious, not reasonably in dispute, and (3) the error appears on the face of the record, so that we need not go outside the record to identify the error or choose between competing inferences, and the facts constituting the error are irrefutable."

*State v. Corkill*, 262 Or App 543, 551, 325 P3d 796, *rev den*, 355 Or 751 (2014) (internal quotation marks omitted). If we determine that the trial court plainly erred, we must consider whether to exercise our discretion to correct the error. In making that determination, we consider, among other things,

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991); *see State v. Vanornum*, 354 Or 614, 630, 317 P3d 889 (2013) (exercise of discretion in determining whether to correct plain error "entails making a prudential call that takes into account an array of considerations, such as the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice in the particular case").

In several cases, we have concluded that it was plain error for the trial court not to strike explicit vouching testimony. *See State v. Higgins*, 258 Or App 177, 178-79, 308 P3d 352 (2013), *rev den*, 353 Or 700 (2014) (plain error not to strike mother's testimony that she knew for sure her daughter was not lying when the daughter said that defendant raped her); *Lowell*, 249 Or App at 366-67 (trial court plainly erred in allowing a police detective to comment on defendant's credibility by stating that he did not think that

defendant "was being very upfront and honest" and that, based on his training and experience, he concluded that defendant's statements were of a type that indicates "that somebody is not being truthful"). However, as we explained in *Corkill*,

> "[w]hen * * * the claimed 'plain error' is associated with the trial court not having *sua sponte* interrupted a line of questioning (or not having excluded the resulting evidence *sua sponte*), the existence of any error does not depend solely on whether—as an abstract matter—the lawyer's questions or the elicited answers would have been inadmissible if they had been objected to. Rather, any 'plain error' must relate to the trial court having not taken affirmative steps to intervene in the parties' litigation."

262 Or App at 551. Thus, the issue we must address is whether, in this case, it was plain error for the court not to interrupt the proceedings and, *sua sponte*, strike the testimony in question.

The state contends that the challenged testimony does not qualify for plain error review because, to decide the issue, we would have to choose between competing inferences about whether defendant made a conscious decision not to object to the testimony. We agree.

"It is well established that an error does not qualify for plain error review if the record contains a competing inference that the party may have had a strategic purpose for not objecting and that competing inference is plausible." *State v. Vage*, 278 Or App 771, 777, 379 P3d 645 (2016) (internal quotation marks omitted); *see State v. Gornick*, 340 Or 160, 169-70, 130 P3d 780 (2006) (no plain error if the evidence is subject to a competing inference that defendant had a strategic purpose in not objecting to the evidence); *State v. Lovern*, 234 Or App 502, 512, 228 P3d 688 (2010) (for plain error analysis, competing inferences must be plausible); *see also Wilson*, 266 Or App at 493-94 (concluding that failure to *sua sponte* strike testimony was not plain error, observing that "there was a reasonable inference that the trial court could have drawn that defense counsel had a plausible reason not to object" to the question so that "the court's obligation to intervene in the examination of the witness was not clear").

Here, given the context of the testimony in question, it is plausible that defendant made a conscious decision not to object to it. Again, the testimony in question arose in the context of questions from the state not about alleged sexual abuse of the victim, but, instead, regarding whether the victim had cut herself. The victim's mother was asked whether she had noticed injuries on the victim and, in response to that question, stated that the victim did have cuts and elaborated (without prompting) that she had asked the cause of the cuts but that the victim "didn't say anything. She—she never lies, and she just didn't say anything." The state followed up only with respect to the victim's lack of explanation for the cuts, confirming that the victim "just wouldn't answer you when you asked where the cuts came from?" In response, the victim's mother again stated that the victim would "never answer * * * [b]ecause she never lies. She's [a] very truthful child." The state then continued asking questions about cuts on the victim's arms.

On cross-examination, defendant immediately asked the victim's mother about her statement that her daughter is truthful:

"Q. * * * [Y]ou testified that your daughter is, I mean, a good girl and * * * always tells the truth, all right? Is that what you said?

"A. Yes.

"Q. All right. Do you recall telling [the victim's physician] * * * that you feel like your daughter lies?"

Defendant then conducted extensive questioning of the victim's mother regarding whether she had discussed concerns with the doctor about her daughter's untruthfulness.

In light of those circumstances, there is a plausible inference that defendant strategically chose not to object to the vouching testimony. First, there is a plausible inference that defendant concluded that the testimony of the victim's mother that her daughter is truthful, in the context of questions regarding the victim's failure to give an explanation regarding cuts on her arms, was not particularly harmful to his case. The testimony was unelicited by the state's questions and did not directly relate to the sexual abuse

allegations but was, instead, on a collateral issue. In addition, the testimony was from the victim's mother, and was, therefore, not the "kind of expert vouching testimony that most often has prompted this court to reverse a criminal conviction * * * because the trial court should have stricken vouching testimony *sua sponte*." *State v. Inman*, 275 Or App 920, 932, 366 P3d 721 (2015). As we noted in *Inman*, we have most often

> "reversed when trial courts failed to *sua sponte* strike testimony delivered by: a witness who was presented as an expert in treating sexual abuse victims with significant experience in spotting indications of suggestion or coaching; a mental-health counselor and a psychosexual evaluator who emphatically and repeatedly offered their opinions that the plaintiff was truthful in her accounts of the alleged abuse; or a detective whose testimony was couched in terms of his expertise in identifying untruthfulness. Thus, we have explained, [i]n many cases where credibility is critical to the outcome, even a single vouching statement by a witness with years of experience and training in the field of child abuse prevention, can be given considerable weight by the jury."

*Id.* (footnotes, internal quotation marks, brackets, and ellipses omitted).

Furthermore, defendant himself, on cross-examination, brought up the victim's mother's statement regarding the victim's truthfulness and used it to attempt to introduce evidence that the victim's mother, in fact, had concerns that her daughter lied. Under the circumstances here—where the testimony was (1) not directly related to the victim's allegations of sexual abuse, but, instead, was aimed at a collateral issue, (2) not responsive to the question asked by the state; (3) from the victim's mother rather than being the "kind of expert vouching testimony" that most often has prompted us to conclude that the trial court plainly should have stricken the testimony *sua sponte*; and (4) intentionally brought up and used by defendant on cross-examination—it is plausible that defendant may have concluded that there was little to gain by objecting to the testimony, and that defendant had a strategic reason not to do so. Given the competing plausible inferences in this case, we

agree with the state that the trial court did not plainly err in failing to strike the testimony *sua sponte.* Accordingly, we reject defendant's first assignment of error.

In his remaining assignment of error, defendant asserts that the trial court erred in denying his motion to strike Young's testimony regarding her diagnosis of the victim as having PTSD. Defendant argues that the court should have granted the motion to strike because "[e]ither Young's testimony regarding her diagnosis of PTSD is not relevant because it was made prior to [the victim] telling Young about the sexual abuse," or it is inadmissible under OEC 403. We address each argument in turn.

Under OEC 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." That rule "establishes a 'low threshold' for the admission of evidence." *State v. Serrano*, 355 Or 172, 191, 324 P3d 1274 (2014), *cert den*, 135 S Ct 2861 (2015) (quoting *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999)). "Where evidence is offered to support an inference, the evidence is relevant so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference." *Id.* (internal quotation marks omitted). "Whether evidence is relevant under OEC 401 is a question of law." *Id.*

According to defendant, "[b]ecause Young's diagnosis of PTSD was made prior to having knowledge of any abusive conduct by defendant, there existed no relationship between that diagnosis and a matter properly provable in the case." The state asserts the diagnosis in this case meets the low threshold for relevance. Specifically, it points out that it had to prove that defendant sexually abused the victim and that evidence that the victim suffered from PTSD makes it more likely "that she suffered from a traumatic event like sexual abuse."

We agree, and note that defendant does not appear to contend that a diagnosis of PTSD would be irrelevant if it had been made after the victim disclosed the abuse. Rather, defendant's argument rests solely on the timing of

the diagnosis compared to the disclosure. However, we are unpersuaded that the fact that Young made her diagnosis before hearing about the sexual abuse renders the diagnosis irrelevant. Young made her diagnosis based on her conclusion that the three main components of PTSD, including a traumatic event, were present. We agree with the state that the fact that Young, at the time she made her diagnosis, "did not yet know the precise cause of the victim's trauma does not render her diagnosis irrelevant." Accordingly, we reject defendant's contention on that point.

Defendant also argues, citing *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), that the "diagnosis of PTSD served the same function as a diagnosis of sexual abuse and should have been excluded under OEC 403 for the same reasons."[2] (Boldface omitted.) In defendant's view, "the PTSD diagnosis was merely a diagnosis of abuse by another name." We review a trial court's "ultimate determination as to whether evidence is unfairly prejudicial under OEC 403 for abuse of discretion." *State v. Shaw*, 338 Or 586, 615, 113 P3d 898 (2005).

*Southard* concerned whether a scientific expert can give an opinion that a child has been sexually abused, in the absence of any physical evidence of abuse, based solely on the expert's interview with the child. 347 Or at 142. The Supreme Court discussed its *Southard* holding in a recent case:

"In that case, the defendant challenged a diagnosis of child sexual abuse from a KIDS Center physician that was based entirely on the child's statements and history. The issue before the court was 'whether a diagnosis of "sexual abuse"—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse.' *Southard*, 347 Or at 142. The court first concluded that a medical diagnosis of child sexual abuse was relevant under OEC 401 and, as noted, that the KIDS Center

---

[2] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

methodologies possessed sufficient indicia of scientific validity for the diagnosis to be admissible under OEC 702. *Id.* at 138-39. However, the court held that, in the absence of corroborating physical evidence, the diagnosis was inadmissible under OEC 403 because its probative value was substantially outweighed by the danger of unfair prejudice. The probative value was slight, the court reasoned, because a diagnosis of child sexual abuse differs from other medical diagnoses that 'turn on an abstruse matter of science,' in that it purports to determine whether conduct—an act of sexual abuse—occurred, and that determination is often within the competence of a lay trier of fact. *Id.* at 134-35. Because the diagnosis in *Southard* did not tell the jury anything that it could not determine on its own, its probative value was slight. *Id.* at 140.

"On the other side of the scale, the court found that the risk of prejudice was great:

> "'The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of scientific method, created a substantial risk that the jury may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence. * * * [T]he diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury [would] not make its own credibility determination, which it is fully capable of doing, but [would] instead refer to the expert's implicit conclusion that the victim's reports of abuse are credible.'

"*Id.* at 140-41 (citations and internal quotation marks omitted). Ultimately, 'the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have.' *Id.* at 142."

*State v. Beauvais*, 357 Or 524, 532-33, 354 P3d 680 (2015) (ellipsis and brackets in original). The court's holding in *Southard* was "narrow" and concerned only whether a diagnosis of sexual abuse was admissible in the absence of physical evidence of abuse. 347 Or at 142.

Contrary to defendant's assertion, the PTSD diagnosis in the case is not equivalent to the sexual abuse diagnosis at issue in *Southard*. First, unlike in *Southard*, a PTSD diagnosis is not basically a determination that the victim's

abuse allegations were credible, which, in turn, would pose the risk that the jury would not make its own credibility determination but would defer to the expert's implicit determination of credibility. While a PTSD diagnosis presupposes a traumatic event in the victim's history, it is not dependent on a particular traumatic event. As the court noted in *Southard*, a "diagnosis of child sex abuse differs from other medical diagnoses." 347 Or at 134. Unlike other diagnoses, a child sexual abuse diagnosis simply "determines whether conduct (an act of sexual abuse by another person) has occurred; the conduct is not complicated, and the ability to determine its occurrence often is a matter within a lay person's competence." *Id*.

Here, in contrast, the diagnosis of PTSD was not simply a determination that certain conduct had occurred; the factors on which such a diagnosis is based—a traumatic event, avoidance, and hyperarousal—do not depend on specific conduct (such as sexual abuse) by another person to be established. While sexual abuse may be the traumatic event that gives rise to the condition in a particular person, such abuse is not a prerequisite required for the diagnosis (unlike a diagnosis of child sexual abuse). In addition, such a diagnosis, unlike the diagnosis at issue in *Southard*, tells the jury something that is not "within a lay person's competence." 347 Or at 134. Young's observation of the victim's physical symptoms, including shaking hands, trembling, and fragmented speech, along with her understanding of the victim's history (including her use of alcohol) formed the basis of the diagnosis. The doctor's testimony on those points was not merely a credibility determination; it told the jury something it was not equally capable of determining. In other words, in this case, the probative value of the evidence was significant and, further, we are unpersuaded by defendant's assertion that it gave rise to a risk of unfair prejudice.

Thus, in this case, unlike in *Southard*, the trial court did not abuse its discretion under OEC 403 in determining that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence. Accordingly, the court did not err in denying defendant's motion to strike.

Affirmed.